FILED

SEP 0 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON L. NUSKEY,
2900 Connecticut Avenue, N.W., #126
Washington, D.C. 20008,

Plaintiff,

v.

JAMES H. LAMBRIGHT,
Chairman and President
Export-Import Bank of the United States
811 Vermont Avenue, N.W.
Room 1215
Washington, D.C. 20571-0002,

Defendant.

CASE NUMBER 1:06CV01573

JUDGE: Paul L. Friedman

DECK TYPE: Employment Discrimination

DATE STAMP: 09/08/2006

JURY ACTION

Dated: September 8, 2006

COMPLAINT

This is an action for injunctive and monetary relief for discrimination inflicted by Defendant, James H. Lambright, Chairman and President, Export-Import Bank of the United States ("Ex-Im, "Bank" or the "agency"), against Plaintiff, Ms. Sharon L. Nuskey, on the basis of her sex (female), age (presently 46 years old, DOB: 1960), and reprisal (for both opposing unlawful discrimination and for engaging in protected EEO activity).

JURISDICTION AND VENUE

1. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. § 2000e-16), the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. § 633a(c)), and the Civil Rights Act of 1991 (42 U.S.C. § 1981a). This claim arises under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e-16, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a, and the Civil Rights Act of 1991 (42 U.S.C. § 1981a).

2. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Washington, D.C., Plaintiff was employed at the Bank's office in Washington, D.C., and Plaintiff resides in Washington, D.C.

PARTIES

3. Plaintiff, Sharon L. Nuskey, is a citizen of the United States of America and is a resident of the District of Columbia. At all relevant times herein mentioned, Plaintiff was employed as a Business Development Specialist, GS-1101-11, Step 10, International Business Development Division ("IBD"), Export Finance Group, by the Defendant. Plaintiff is a female and presently is 46 years old.

4. Defendant, James H. Lambright, is the Chairman and President of the Export-Import Bank of the United States ("Ex-Im, "Bank" or the "agency"), a resident of the District of Columbia, and is sued in his official capacity as such. Ex-Im is an establishment of the executive branch of the Federal government pursuant to 5 U.S.C. § 105.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. On May 20, 2005, Plaintiff contacted an EEO counselor in the Ex-Im Equal Opportunity and Diversity Programs Office to initiate counseling and file an informal EEO complaint. Plaintiff alleged that she had been subjected to discrimination and harassment on the basis of her sex (female), age (then 45 years old), and reprisal (for both opposing unlawful discrimination and for engaging in prior protected EEO activity) when her first level supervisor,

Mr. Craig O'Connor (Director, Southeast and Central Europe Business Development ("SECE")), and/or second level supervisor, Mr. Michael Forgione (IBD Vice President):

a. Excluded Plaintiff from important meetings that her younger male probationary colleagues were invited to attend by their supervisors;

b. Asked Plaintiff to attend other meetings just before they were about to begin or after they were in progress, leaving her little or no time to prepare;

c. Failed to inform Plaintiff about various issues that fell within her program area of responsibility, whereas other supervisors did not appear to do the same with her younger male probationary colleagues;

d. Limited Plaintiff exposure to the Bank's Directors;

e. Did not assign Plaintiff opportunities for international travel as set forth in her position description and as offered to others, to include an arbitrary $1250 limit on her approved travel although her younger male probationary colleagues did not have the same or similar limit on their travel;

f. Denied Plaintiff opportunities for career advancement that her three younger male probationary colleagues had been given;

g. Subjected Plaintiff to a discriminatory comment on May 19, 2005, by stating that she "seemed to think that she was much better educated and older" than her three younger male probationary colleagues but that they were all hired "at the same level";

h. Spoke to Plaintiff in a hostile manner, stating on May 19, 2005 that she was "a liar" and told her on October 5, 2004 that, "if you come into this office again you will leave with your head on a platter"; and

i. Refused Plaintiff's request to have a colleague present at a May 20, 2005 meeting with her second level supervisor.

6. During the EEO counseling period, on or about May 20, 2005, Plaintiff returned to the Bank's EEO Office to amend her informal EEO complaint to include new allegations that

she had been subjected to further discrimination and harassment on the basis of her gender, age, and in reprisal for her prior protected EEO activity. Specifically, Plaintiff alleged that Mr. O'Connor and/or Mr. Forgione:

a. Terminated Plaintiff from her employment with the agency, effective on May 20, 2005;

b. Refused Plaintiff's request on the date of her termination to retrieve copies of emails from her computer regarding her work performance; and

c. Held a staff meeting on May 23, 3005, during which Plaintiff's second level supervisor, Mr. Forgione, announced her termination and his reasons for it, and stated that he "could not see the same thing happening to anyone else in the office."

7. After a failed mediation attempt, Plaintiff was deemed to have completed EEO counseling for her informal EEO complaint and was issued a Notice of Right to File a Formal EEO Complaint by the agency's EEO office on August 1, 2005, which her counsel received on August 4, 2005.

8. On August 15, 2005, Plaintiff filed a formal complaint of discrimination (Agency Complaint No. EODP 05-02), which alleged that she was subjected to discrimination and harassment on the basis of her sex and age and in reprisal for the same reasons that she raised with the EEO Counselor in her original and amended informal complaints.

9. Plaintiff was advised by Ms. Patrease Jones-Brown, Director of the agency's EEO office (and who also served as the EEO Counselor for Plaintiff's complaint), that her EEO complaint was accepted for investigation by letter, dated August 19, 2005 and which was received by Plaintiff's counsel on August 22, 2005.

10. After Plaintiff's counsel submitted a letter to the agency's EEO office requesting that numerous factual corrections be made to the agency's accepted claims, Ms. Jones-Brown issued a corrected notice of acceptance of claims letter, dated August 30, 2005 and which was received by Plaintiff's counsel on September 2, 2005.

11. An investigation of this EEO complaint was commenced, and then completed, when the Bank issued a Report of Investigation ("ROI") to Plaintiff on March 7, 2006. Accompanying the ROI was a letter from Ms. Jones-Brown, dated March 7, 2006 and which was received by Plaintiff's counsel on March 9, 2006, which provided Plaintiff with notice of her rights on proceeding on her EEO complaint.

12. By letter dated April 10, 2006, Plaintiff submitted a request to the agency's EEO office for a final agency decision ("FAD") on her EEO complaint.

13. On June 12, 2006, Plaintiff received a copy of the FAD, dated June 7, 2006, which found that "[a] preponderance of evidence in the investigative record does not support [Plaintiff's] allegation that [she was] subjected to disparate treatment and harassment based upon sex, age and reprisal, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA")."

14. Accordingly, Plaintiff has exhausted her administrative remedies in this matter, entitling her to file a civil action under Title VII and the ADEA.

## STATEMENT OF FACTS

15. On August 9, 2004, Plaintiff was hired by the Bank with a "Superior Qualifications" appointment to serve in the position of Business Development Specialist, GS-1101-11, Step 10, in the International Business Development Division ("IBD") of the Export

Group. Plaintiff came to the Bank with a 15 year career in the international and economics fields, and had earned a Bachelor of Arts Degree (in Economics and English), two Masters degrees (in Public Policy and Business), and completed course work for her Ph.D. from several prestigious U.S. and international universities. Plaintiff also is a published author of scholarly publications on international economic and market issues, and has taught economics and business courses to undergraduate and graduate students at several prominent universities.

16. At about the same time that Plaintiff was hired for her position at the Bank, three less experienced, younger males were also hired as Business Development Specialists in IBD. They were Mr. Charles Barnett (male, then 36 years old, born in 1969), Mr. William Hess (male, then age 29 years old, born in 1975), and Mr. Brian Sant Angelo (male, then age 31 years old, born in 1973). Plaintiff and her three younger male colleagues all were required to complete a one-year probationary period in their assigned positions.

17. At the Bank, Plaintiff was assigned professional duties and responsibilities for Southeast and Central Europe, which included the countries of Albania, Bosnia-Herzegovina, Bulgaria, Croatia, Czech Republic, Hungary, Macedonia, Poland, Romania, Serbia-Montenegro, Slovakia and Slovenia. Among other things, Plaintiff was responsible for attending various internal and external meetings with Bank management and other staff and Bank clients, as well for attending domestic and international trade shows and seminars.

18. During the majority of Plaintiff's probationary period from August 2004 through March 2005, her immediate supervisor was Ms. Margaret Kostic, then Director of SECE. While under Ms. Kostic's supervision, Plaintiff regularly received positive feedback from Ms. Kostic, Ms. Linda Conlin (Director, Export-Import Bank), Ms. April Foley (then Vice Chair

Export-Import Bank), and other managers and colleagues regarding her performance and conduct. Approximately one month prior to Plaintiff's termination, she received an overall rating of "Excellent" on a written performance appraisal and the highest numerical score of the four Business Development Specialists, dated April 5, 2005, which was signed by Ms. Kostic and Mr. Forgione.

19. Mr. Craig O'Connor became Plaintiff's first-level supervisor after a departmental reorganization, and he became the Director, SECE, in February or March 2005. Shortly thereafter, Plaintiff began to be excluded from important meetings that her younger male colleagues and supervisors were invited to attend. In these meetings, matters that were relevant to Plaintiff's areas of responsibility were discussed without her being present. On several occasions, Plaintiff was asked to attend similar meetings, but only after they were already in progress, leaving her little or no time to prepare so that she could make a meaningful contribution. Mr. O'Connor also regularly failed to inform Plaintiff about various issues that fell within her program responsibility. This did not occur with Plaintiff's younger male probationary colleagues.

20. On May 11, 2005, Plaintiff met with Mr. Forgione after another incident of a meeting taking place that she was not informed about until it was well underway. At that time, Plaintiff told Mr. Forgione that she had been inappropriately excluded from meetings that fell within her program responsibility to which her three younger male probationary colleagues were regularly invited. Plaintiff also told Mr. Forgione that she believed that after Mr. O'Connor became her first-level supervisor, she was not included as a full member of the department as she had been under Ms. Kostic's supervision. Plaintiff further told Mr. Forgione that she was

uninformed about SECE department activities; excluded from meetings with parties both external and internal to the Bank; limited her exposure to the Bank's Directors (although it was made clear that the Business Development Specialists were hired to provide support to the Directors); not assigned opportunities for international travel as set forth in her position description and as offered to others; and was denied opportunities for career advancement that her three younger male probationary colleagues had been given.

21. During this same meeting, Plaintiff also explained to Mr. Forgione that she had recently taken online EEO training, which stressed the importance of equal opportunities for all employees. Plaintiff further said that she believed that she was being treated less favorably than her three younger male probationary colleagues because of her gender and age. In response to Plaintiff's concerns, Mr. Forgione replied, "You're right. You are always so aggressive; I can't believe it has taken you so long to say anything."

22. Around this same time period in mid-May 2005, Plaintiff was interested in attending two overseas events that were pertinent to her program area. She had learned about these opportunities on her own initiative. Plaintiff received an all expense-paid invitation to be part of a high-level U.S. Department of State approved study/information tour to Germany that was pertinent to her work. There was also a European Bank for Reconstruction and Development ("EBRD") Annual Meeting and Business Forum in Serbia-Montenegro that was scheduled to take place several days before the program in Germany.

23. Plaintiff believed that the German study/information tour would provide valuable lessons about the transition from the centrally planned Communist to market economies that could be applied to the Southwest and Central European countries that were within her area of

responsibilities. Moreover, since Plaintiff is an author of scholarly publications and articles addressing the economic and business transitions in the former East Germany, she had the relevant background knowledge to make this trip valuable for the agency. She also thought participation would be valuable for the Bank because she planned to foster relationships during her trips with contacts in those growing markets.

24. Accordingly, Plaintiff submitted separate written requests to Mr. Forgione to travel on official time to Germany and Serbia-Montenegro. In response, Mr. Forgione told Plaintiff that she could not travel to Germany because he did not believe that the trip would provide any value for the Bank or his division. Plaintiff instead offered to use her accrued annual leave to go to Germany to go on the trip. Plaintiff also indicated that she had obtained permission from the sponsors to depart a week early, which would leverage the value of the expense-paid portion of the trip by attending the EBRD Meeting and performing due diligence on the Serbian market, and thus fulfilling the mission of the Bank. In prior years, Bank employees had regularly attended this meeting, which attracts over 2,000 policy experts, bankers, and investors who have active interests in the market.

25. After receiving this additional information, Mr. Forgione said that Plaintiff could travel to the EBRD Annual Meeting on official time. When Plaintiff asked if the Bank would pay for her expenses related to the EBRD Annual Meeting, Mr. Forgione gave all appearances that her request would be approved. He came into Plaintiff's office and said she "can do this" in response to her written request. He told her to submit of a list of goals that she aimed to accomplish, which she did. Mr. Forgione also advised Plaintiff to proceed with her travel plans, which she did, and she became a member of the official U.S. delegation to the EBRD Annual

meeting.

26. When Plaintiff ultimately submitted a travel order for the EBRD meeting, Mr. Forgione reversed his decision and refused to pay for her travel because he said it exceeded an apparently new and arbitrarily set $1250 limit. Although both of Plaintiff's travel requests were denied, Plaintiff's three younger male probationary colleagues had been approved to go on similar business trips on official time and expense around this same period of time. In fact, the Bank paid for their expenses which were seven to nine times the amount that Plaintiff had requested for her travel.

27. On May 19, 2005, Plaintiff submitted a revised travel order that changed her mode of travel from Germany to Serbia-Montenegro from airplane to train, and limited her reimbursable expenses (because she would be personally paying a large part of out-of-pocket expenses) to $1248, with the hope that it would be acceptable to Mr. Forgione and that he would once again approve the trip.

28. Later that same day, Plaintiff, Mr. Forgione and Mr. O'Connor met to further discuss the nature of Plaintiff's planned trip. During this discussion, Mr. Forgione remarked that Plaintiff "seemed to think that she was much better educated and older than her three male colleagues," but that they all were hired at the same grade level. Plaintiff replied that she wanted to be treated just like the three of them. Mr. Forgione then expressed his disagreement with Plaintiff that Serbia-Montenegro was an important market and stated that she did not need to communicate with anyone there during her trip, even though Bank experts Ms. Kostic and Natasha Zamecnik, an Economist covering Serbia-Montenegro, would disagree. When Plaintiff attempted to explain the trip's importance and potential, Mr. Forgione retorted that it "doesn't

matter if you've read it in some book." He then abruptly stated that their meeting was terminated.

29. Before she left the room, Plaintiff reminded Mr. Forgione that he had not yet made a decision on her revised travel order, which was one of the primary purposes of their meeting. Mr. Forgione said that the meeting was still terminated, and loudly stated, "You are a liar!" As Plaintiff was leaving the office, Mr. Forgione said he was going to the Bank's Human Resources office. Plaintiff offered that they go there together (Plaintiff had also previously consulted with HR about her ongoing issues with Mr. Forgione), but Mr. Forgione declined. He stated that Plaintiff could go to the EEO office, too.

30. Shortly after this meeting on May 19th, on the same day, Plaintiff went to the Bank's EEO Office to discuss what occurred at her meeting with Mr. Forgione and Mr. O'Connor. The EEO Office Director, Ms. Patrease Jones-Brown, suggested that Plaintiff first discuss the matter with Mr. Forgione's supervisor, Mr. John Emens.

31. Plaintiff thereafter spoke with Mr. Emens later that same afternoon and explained that Ms. Jones-Brown suggested that she meet with him and relay the pertinent events as they had unfolded in a brief point-by-point manner. Mr. Emens nodded and said he was aware of some of what was going on, and listened to Plaintiff for approximately ten minutes. Mr. Emens said he would review the relevant information and e-mails that she had given to him that day, and would get back to her the following morning about the situation in general, and whether or not the Bank would pay the penalty and related charges for her airplane fare, in particular. However, Mr. Emens neither contacted Plaintiff nor returned the file to her at any time after this meeting.

32. Prior to Plaintiff's above-referenced meeting with Ms. Jones-Brown, Plaintiff also raised the issue of Mr. Forgione's discriminatory treatment towards her with Mr. O'Connor. Plaintiff showed Mr. O'Connor copies of some of the communications at issue between Mr. Forgione and Plaintiff, and in which Mr. O'Connor had been copied. Mr. O'Connor acknowledged that he did not do anything to support Plaintiff and stated, "I guess I haven't read the emails."

33. On the morning of May 20, 2005, Plaintiff formally initiated EEO counseling with Ms. Jones-Brown because she believed that Mr. Forgione had subjected her to discrimination, harassment and reprisal on the basis of her sex (female), age (then 45 years old) and prior EEO activity (for complaining to Mr. Forgione and Mr. O'Connor that she had received less favorable treatment than her younger male probationary colleagues) for the reasons described above. Plaintiff also contended that Mr. O'Connor had supported Mr. Forgione's discriminatory and retaliatory actions and attitude toward her.

34. Later that same day, Mr. Forgione called a meeting with Plaintiff at 2:00 p.m. without notifying her about subject matter of the meeting in advance. Plaintiff asked if a colleague could accompany her to the meeting because she was shaken from their previous meeting, but Mr. Forgione refused her request. At that meeting, which Mr. Greg D'Adamio (a Human Resources Officer) also attended, Mr. Forgione stated that he felt that Plaintiff was "less than an ideal fit" and that he was terminating her employment with the Bank. She was then given a copy of the agency's letter of termination.

35. This was the first time that Mr. Forgione or anyone else at the Bank had notified Plaintiff that there was any problem with her job performance or any other aspect of her

employment. Plaintiff's supervisors, senior Bank management, and members of the Bank's Board had consistently indicated that her work and conduct were excellent.

36. Mr. D'Adamio then gave Plaintiff a form to sign for her resignation during the meeting so she would not be terminated, but she refused to sign the form. Plaintiff believes Mr. D'Adamio's effort to coerce a "voluntary" resignation further demonstrates a blatant attempt by the agency to deprive Plaintiff of her right to complain about the illegal conduct of Mr. Forgione and Mr. O'Connor, and thus assist management in concealing their unlawful actions.

37. Mr. Forgione then pointed out that the termination notice said Plaintiff was fired effective at 2:00 p.m. that day, and asked if she "was aware what time it was." A security officer was then called to escort Plaintiff to her desk to collect a few of her personal belongings and then immediately escort her out of the building. Plaintiff was told that she would have to schedule a time on another day to retrieve the rest of her personal belongings at her desk. All of this happened just one day after Mr. Forgione knew that Plaintiff had gone to the EEO office to complain about him, and nine days after she complained directly to him about disparate treatment by Mr. O'Connor.

38. Before Plaintiff was escorted out of the Bank's building, she asked Mr. Forgione if she could retrieve and print emails that were maintained on her work computer. The emails included positive feedback that others (Mr. Emens, Mr. Forgione, Mr. Jeffrey Miller, Mr. Barnett and Mr. Ellis (on behalf of Ms. Conlin)) had given to Plaintiff about her performance during her probationary period. There were also other emails exchanged with Mr. Forgione and Mr. O'Connor, specifically relating to Plaintiff's belief that she was being discriminated against based on her sex and age. Mr. Forgione flatly denied Plaintiff's request to retrieve emails.

39. Shortly after Plaintiff's termination, Mr. Forgione called an all-hands staff meeting at or about 9:30 a.m. on Monday, May 23, 2005 with the sole purpose of announcing Plaintiff's termination. Mr. Forgione specifically stated that Plaintiff had been "terminated" because she was "not a good fit" for the Bank. He continued by stating that the needs of the department and Plaintiff's expectations did not coincide. According to Mr. Forgione, Plaintiff had a "misperception of the job" that she was hired to fill. Mr. Forgione also said that he "could not see this same thing happening to anyone else in the office." He was apparently referring to Plaintiff's three younger male colleagues, who were still serving their probationary periods at that time.

COUNT ONE - DISCRIMINATION AND HARASSMENT BASED ON SEX AND AGE FOR ACTIONS TAKEN AGAINST PLAINTIFF PRIOR TO HER COMPLAINT OF DISPARATE TREATMENT

40. Plaintiff hereby realleges and reincorporates by reference Paragraphs 1 through 39 of this Complaint.

41. Mr. Forgione and/or Mr. O'Connor regularly excluded Plaintiff from important meetings within her area of responsibility. Additionally, Mr. Forgione and/or Mr. O'Connor asked Plaintiff to attend other meetings just before they were about to begin or after they were in progress, leaving her little or no time to prepare. Plaintiff's similarly situated younger male probationary colleagues were not subjected to this similar adverse treatment by agency management.

42. Mr. Forgione and/or Mr. O'Connor also regularly failed to inform Plaintiff about issues that fell within her program area of responsibility, whereas other supervisors did not do the same with her similarly situated younger male probationary colleagues.

43. Mr. Forgione and/or Mr. O'Connor regularly limited Plaintiff's exposure to the Bank's Directors, whereas the same practice was not done with her similarly situated younger male probationary colleagues.

44. Defendant unlawfully subjected Plaintiff to discrimination on the basis of her sex and age by excluding her from important meetings that were within her area of responsibility, failing to inform her about issues that fell within her responsibility, and limiting her exposure to Bank Directors.

COUNT TWO - DISCRIMINATION, HARASSMENT AND REPRISAL BASED ON SEX, AGE FOR ACTIONS TAKEN AGAINST PLAINTIFF AFTER HER COMPLAINTS OF DISPARATE TREATMENT TO BANK MANAGEMENT AND THE BANK'S EEO OFFICE

45. Plaintiff hereby realleges and reincorporates by reference Paragraphs 1 through 44 of this Complaint.

46. Mr. Forgione and/or Mr. O'Connor did not assign Plaintiff opportunities for international travel as set forth in her position description. When Plaintiff sought out international travel opportunities on her own initiative, which she believed would benefit the Bank, her supervisors set an arbitrary $1250 limit on her initially approved travel and required her to travel on her own time. In contrast, the agency authorized international travel on official Bank time for Plaintiff's younger male probationary colleagues, and did not impose a similar monetary limit on their travel.

47. Moreover, Mr. Forgione subjected Plaintiff to a derogatory comment on May 19, 2005, by stating in the presence of Mr. O'Connor that she was "much better educated and older" than her three younger male probationary colleagues, but that they were all hired "at the same

level." During this same meeting, Mr. Forgione spoke to Plaintiff in a hostile manner, stating that she was "a liar." At an earlier time on October 5, 2004, Mr. Forgione told Plaintiff that, "If you come into this office again you will leave with your head on a platter." Plaintiff's three other similarly situated younger male probationary colleagues were not subjected to these types of derogatory remarks from agency management.

48. Defendant unlawfully subjected Plaintiff to discrimination on the basis of her sex and age and her prior EEO activity by not assigning her opportunities for international travel, denying requests for international travel sought on her own initiative to benefit the Bank and by setting an arbitrary monetary limit on that travel, denying her opportunities for career advancement, and by making harassing and derogatory comments to her.

COUNT THREE - DISCRIMINATION BASED ON SEX, AGE AND REPRISAL FOR TERMINATING PLAINTIFF'S EMPLOYMENT WITH THE AGENCY

49. Plaintiff hereby realleges and reincorporates by reference Paragraphs 1 through 48 of this Complaint.

50. Plaintiff (female, then 45 years old, born in 1960) was terminated from her position with the Bank, before the end of her probationary period, on May 20, 2005.

51. This action was taken shortly after Plaintiff opposed unlawful discriminatory and harassing treatment to her first and second level supervisors beginning on May 11, 2006, complained to the agency's EEO office regarding this treatment on May 19, 2005, and engaged in protected EEO activity by formally initiating EEO counseling and filing an informal EEO complaint earlier on the same day of her termination (May 20, 2005).

52. Defendant unlawfully subjected Plaintiff to discrimination and harassment on the basis of her sex and age, and retaliation for her prior protected EEO activity by terminating her employment with the agency on May 20, 2005.

COUNT FOUR - DISCRIMINATION, HARASSMENT AND REPRISAL BASED ON SEX, AGE AND PRIOR EEO ACTIVITY BY MAKING DISPARAGING COMMENTS ABOUT PLAINTIFF TO OTHER BANK EMPLOYEES AFTER THE DATE OF HER TERMINATION

53. Plaintiff hereby realleges and reincorporates by reference Paragraphs 1 through 52 of this Complaint.

54. On May 23, 2005, Mr. Forgione held a staff meeting, during which he specifically stated that Plaintiff had been "terminated" because she was "not a good fit" for the Bank, that the needs of the department and Plaintiff's expectations did not coincide, that Plaintiff had a "misperception of the job" that she was hired to fill, and that he "could not see this same thing happening to anyone else in the office."

55. Defendant unlawfully subjected Plaintiff to discrimination and harassment on the basis of her sex and age, and retaliation for her prior protected EEO activity by making disparaging comments about her termination to other Bank employees.

HARM TO PLAINTIFF CAUSED BY THE AGENCY'S DISCRIMINATORY, HARASSING AND RETALIATORY ACTS

56. Paragraphs 1 through 55 are realleged and are incorporated herein.

58. Because of the unlawfully discriminatory, harassing and retaliatory acts of Defendant set forth above, Plaintiff has suffered harm to her career, including lost past, present and future wages, salary, and benefits, loss of professional standing, career opportunities, career advancement, harm to her ability to secure other equivalent permanent employment, and other

damages. In addition, Plaintiff has suffered humiliation, pain and embarrassment as a result of Defendant's discriminatory, harassing and retaliatory conduct. Plaintiff also incurred significant attorney fees and costs that were caused by Defendant's unlawful discrimination, harassment and retaliation.

PRAYER FOR RELIEF

WHEREFORE, based on the foregoing Complaint, Plaintiff respectfully prays that this Court:

a. Enter judgment in favor of Plaintiff against Defendant;

b. Permanently enjoin Defendant, its agents, servants and/or employees acting within the scope of their employment from engaging in further acts of discrimination, harassment and retaliation against Plaintiff;

c. Reinstate her employment with the Bank at the GS-1101-11, Step 10 level, retroactive to May 20, 2005, with back pay, appropriate step increases equal to those of the highest performing IBD Development Specialist, interest and attendant benefits (including repayment of her student loans), calculated pursuant to the Back Pay Act;

d. Reassign her to a mutually acceptable position to another office outside of the supervision of Mr. Forgione and/or Mr. O'Connor;

e. Expunge all Bank records of any references to her termination, including, but not limited to, her Official Personnel Folder, personnel files, and all supervisory files maintained on her;

f. Reimburse all her out-of-pocket travel expenses for her trip to Germany and Serbia-Montenegro that were lost as a result of the Bank's precipitous termination of her;

g. Award compensatory damages up to $300,000;

h. Award Plaintiff reasonable attorney's fees and the costs incurred in pursuing this action; and

j. Order such other relief as the Court may deem just and proper.

JURY TRIAL DEMAND

Plaintiff requests a jury trial.

Respectfully submitted,

Diana J. Veilleux
D.C. Bar No. 418292
Lisa A. Bernstein
D.C. Bar No. 466215
Shaw, Bransford, Veilleux & Roth, P.C.
1100 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
Telephone: (202) 463-8400
Facsimile: (202) 833-8082

Counsel for Plaintiff