# AFFIDAVIT

Washington, DC

I, Cosimo M. Forgione, male, age 57 (DOB:[redacted]), GS-15, Vice President, International Business Development Division (IBD), Export-Import Bank of the United States (hereafter Export-Import Bank), hereby solemnly swear that this statement is the truth, the whole truth and nothing but the truth, so help me God.

1. I have been in my current position since April 2004. IBD is divided into the following regions: (1) The Americas; (2) Africa; (3) Southeast and Central Europe; (4) Asia and Middle East; and, (5) Russia, CIS, Turkey. A regional director is assigned to each identified region. A member of the Export-Import Board of Directors may also express an interest in a particular country or region.

2. In July-August 2004 four employees in grades GS-9 and GS-11 were hired to support regional managers and members of the Board of Directors. The hirees were: Ms. Sharon Nuskey, Mr. William Hess, Mr. Charles Barnett and Mr. Brian sant Angelo. Ms. Nuskey was hired at the highest grade (GS-11, Step 10) of the four. Subsequently, Mr. Ken Vranich was hired. Each new hiree was required to serve a probationary period of one calendar year. At the completion of the probationary period management determines if the probationary employee will continue in the Federal service as a permanent employee.

 Initials____

Ms. Nuskey was assigned to the Southeast and Central Europe Region.

3. My personal interaction with the probationary employees involved occasional casual one-on-one discussions regarding the status of projects/assignments and/or their individual concerns. My primary interaction with the probationary employees is generally predicated on the support requirements of senior Export-Import Bank management or that of individual members of the Board of Directors. When I received a support requirement from senior management or Board Director I would contact the respective regional director and/or probationary employee handling the issue(s) to accommodate the requirement. Activity in the respective regions is by its' nature not equal and changes over time; since my arrival I have received more requests regarding the Middle East and the Americas regions. The Southeast and Central Europe region has generated the fewest number of requirements.

4. During my Divisional staff meetings the probationary employees participate by responding to my inquiries regarding the status of their respective projects/assignments. Ms. Nuskey was invited to each and every meeting and to the best of my recollection attended all meetings during her tenure here. Ms. Nuskey was comparable to the other probationary employees in responding to my inquiries.



Initials

5. Ms. Nuskey was given a special assignment in September 2004, directly assigned by Jeffrey Miller, SVP Export Finance Group (of which IBD is one division) to assist in the planning and preparation for the Bucharest, Romania Conference. I spoke to her directly in my office to explain the scope of the assignment and what she would be doing. During this discussion Ms. Nuskey said, "I am a GS-11 and with my background and experience I would think I could be used more usefully doing something else." I explained the importance of the assignment and indicated that in the previous year her direct supervisor, Margaret Kostic (GS15) preformed essentially the same duties herself for a similar conference in the region. This was the first and only time that a probationary employee questioned an assignment made to them by me. I explained that there was to be "dotted line" relationship with Lorrie Seacrest, Senior Vice-President (SVP) of Communications. The project involved a lot of work and required several weeks to complete. Ms. Seacrest stated on several occasions that Ms. Nuskey did not seem as committed to the project as Ms Seacrest felt was necessary from the mid-way point to the end of the project.

6. About 2-3 weeks prior to the Conference date Mr. Jeffery Miller, SVP called a meeting of all participants planning the Bucharest Conference where he indicated that he was totally unhappy with the progress to date. Mr. Miller wanted to know, among other things, the status of the invitations sent out and responses received, the names of panelist

 Initials ______

invited and who had accepted and the hotel selected to accommodate the conference. He was disappointed and emphatically asked who was going to take ownership; everyone was silent and I was obliged to accept ownership. Ms. Nuskey had not followed up properly on the invitations, responses and panelists. As a result I personally became involved in all meetings and ~~made~~ began daily follow up on the conference status. This action together with efforts by the majority of IBD staff resulted in a Conference outcome that was "satisfactory" according to Mr. Miller, SVP and had a decent though not spectacular attendance.

7. Ms. Nuskey did meet with me on or about May 11, 2005 and discussed several issues regarding her supervisor, Mr. Craig O'Connor. Ms. Nuskey stated that "she was being excluded from attending staff meetings where issues related to her areas of responsibility were discussed and that other probationers attended." I indicated to her that I was unaware of any specifics but if there were meetings that she felt that she should attend I would discuss such with Mr. O'Connor. I did speak to Mr. O'Connor and he indicated that as far as he knew she had been included in essentially all meetings. He also stated that he posted his meetings on the division calendar and expected her to inquire about the meeting(s) when she saw them on the calendar. I would like to state what I think is obvious. Because a meeting occurs regarding Southeast and Central Europe it does not mean that both persons (O'Connor and Nuskey) assigned to that region must or even should attend. There are many reasons why in a specific instance this is true including

 Initials

the need to cover other office responsibilities. When I have a meeting with a representative from a region I do not always ask for the staff to sit in on that meeting. My superiors certainly do not invite me to all meetings dealing with matters over which I have responsibility nor do I expect them to.

8. On or about May 11, 2005 Ms. Nuskey did raise concern that she was "uninformed about SECE department activities". I informed her that when Ms. Margaret Kostic supervised her she basically sat next (a partition divided their space) to her supervisor. However, under Mr. O'Connor's supervision they are separated by a couple of offices and 2-3 doors. I suggested that both she and Mr. O'Connor should make a better effort to communicate with each other. I informed Mr. O'Connor that he needed to put forth more effort to communicate with Ms. Nuskey.

9. On or about May 11, 2005 Ms. Nuskey stated that she had been excluded from meetings with parties both external and internal to the Bank. I pointed out that I would talk to Mr. O'Connor but it was my impression that this was not happening. Mr. O'Connor categorically stated that this was just not the case.

10. On or about May 11, 2005 Ms. Nuskey stated that she had limited exposure to the Directors. I informed her that individual exposure to Directors had and has to do with individual Director circumstances at any particular time. If a Director has to travel or



Initials

meet with visitors, then the amount of contact increases in preparation for travel and/or briefing memos. On the other hand, if such activities are reduced for the Director, her (Ms Nuskey') exposure will be reduced accordingly.

11. On or about May 11, 2005 Ms. Nuskey stated that she was not assigned opportunities for international travel. I reminded Ms Nuskey of her initial interview and the numerous occasions in divisional meetings that the four (new) positions were created in large part to assist in serving the Directors and that Ms. Nuskey and the other hires would be expected to do the majority of the "grunt work" generated in the division as the most junior people. International travel was not given as an immediate job requirement or in any way a "perk" of employment.

I believe I mentioned that she was to have been the first probationary employee to travel in connection with the conference in Romania, but due to budget constraints only one person could go from her region; Ms. Kostic made the decision as to who would go.

12. On or about May 11, 2005 Ms. Nuskey indicated that she had been denied opportunities for career advancement that her three male colleagues had been given. I informed her that I was not certain exactly what she meant by "career advancement" but that I was unaware of any such opportunities. I indicated that I would discuss the matter with Mr. O'Connor. Mr. O'Connor indicated that Ms. Nuskey had not brought this

 Initials_______

complaint to him personally and that it was not at all accurate. Mr. O'Connor cited his previous experience with Brian sant Angelo while indicating the same approach was used in mentoring both individuals.

13. On or about May 11, 2005 Ms. Nuskey did indicate to me that she had recently taken inline EEO training, which stressed the importance of equal opportunities for all employees. My response to this statement was "Good".

14, On or about May 11, 2005 Ms. Nuskey did indicate to me that she believed that she was being treated less favorably than her male colleagues. I informed her that I did not believe that such was true.

15. Ms. Nuskey indicates that I made the following statement in our discussion on May 11, 2005 "You're right. You are always so aggressive. I can't believe it's taken you so long to say anything." I cannot recall saying those words and deny outright that I said "your right" but would relate Ms. Nuskey's first day of work in August, 2004 . Ms. Nuskey complained to the Human Resources Department her dissatisfaction with the manner in which HR had handled her request for repayment of tuition. Ms. Guzman of HR called me and relayed Ms. Nuskey's request that I immediately go the HR and resolve the issue. I told Ms Guzman that I could not go to HR at that time because I was in a meeting. Ms. Nuskey then went, without supervision and on her own to my direct



Initials EA

supervisor, Mr. John Emens, Deputy Group Manager. When Ms. Nuskey was not satisfied with these discussions she then went directly to Mr. Jeffery Miller, SVP office, sitting outside his office until Mr. Miller made time to discuss the same issue with him. I contend that for a probationary employee to take those actions on their first day of work demonstrates a somewhat aggressive personality. Thus, given this knowledge, I would have been very surprised that it took so long for Ms. Nuskey to express her dissatisfaction to me regarding the issues she raised on or about May 11, 2005.

16. In mid-May Ms. Nuskey came to me about a Study/Informational Tour of Germany. I told her that it did not fit into anything we normally would participate in at Export-Import Bank. She stated that the trip would be paid for by another government agency and would she thought help her individual career development. After discussions with Mr. Emens, I approved the Study/Informational Tour. Within a day after my approval of the Germany trip, Ms. Nuskey indicated that she desired to attend the European Bank for Reconstruction and Development (EBRD) Annual Meeting and Business Forum in Serbia-Montenegro, which immediately followed the Study/Informational Tour. (I since came to understand that the EBRD effect took place before the German trip). It had already been decided by Export-Import Bank management that we would not attend the 2005 EBRD Annual Meeting. However, after another discussion with Mr. Emens, I agreed to approve her attendance at the EBRD even though she was a junior officer and Export-Import Bank would not realize any substantive benefit from her presence at the



Initials____

meeting. I concluded that since she was there on the Study/Informational Tour, which was already being paid for why not attend the EBRD meeting. Typically, Export-Import Bank SVPs or Directors attend the EBRD. On occasion regional managers on my staff have attended. Normally the decision to attend would technically be mine to make but in reality my boss Mr. Miller (or in his absence his Deputy Mr. Emens) would need to give approval.

17. Initially, I was under the impression that the German Study/Informational Tour and the EBRD were within a day of each other. Ms. Nuskey will say that she gave me a paper indicating that the EBRD started four days earlier. My initial approval of her attendance at the EBRD was in any case based on my thought that there would not be a gap between the two events. Now I was being presented with a situation where Ms. Nuskey would attend two events in two countries separated by a four-day gap. Ms. Nuskey proposed a variety of reasons for her to travel to other countries in the area. After considering that one of our Directors would imminently be traveling to that region and that none of the countries Ms. Nuskey had proposed were in our strategic business plan, I said "no", we are under budget constraints. In ~~any~~ an effort to resolve the situation, I informed Ms. Nuskey that if she could get there and back for $1250.00 (then assuming Ms Nuskey would favor returning to the U.S. work for the gap period and then return to the second country involved). As I recall she tried, but later said it could not be done. There was a



Initials ____

discussion about her use of accrued annual leave for the four-day period. JT Mullen, manager of the Travel Office called me and said that Ms. Nuskey had been spending time in the Travel Office making numerous inquiries including the need to take personal leave to cover the gap between events. I had not requested such information regarding leave usage. In addition it was becoming increasingly apparent that Ms. Nuskey's was waging a relentless campaign to travel without regard to well-planned IBD strategies specifically approved by senior management. I concluded that Ms. Nuskey could not justify the time she was spending organizing a trip with such little organizational value. At this juncture I indicated that to Ms. Nuskey that she could not go to the EBRD. I only cut out the EBRD portion; it was made clear she could continue on with the German Study Tour. I also want to point out that in all her work to put this trip together, to the best of my knowledge Ms. Nuskey never got country clearance from the State Department or Embassy where the EBRD event was to be held. This is an absolute government requirement and must be done with sufficient time for State and the Embassy to process the request. If clearance were not received in advance travel to that country in any official government capacity would be prohibited.

18. The discussion regarding the EBRD/German Tour trip became heated as to why she felt she should be going to all of the countries she cited. During this discussion Ms. Nuskey indicated that I had agreed that she had been denied equal opportunities in comparison to her male colleagues a statement she alluded to in a memo and which I had



Initials

never said. Additionally, Ms, Nuskey indicated that she was informed that the IBD's Strategic Plan would soon be changed designating the countries that she had proposed travel to as secondary target markets allowing travel to these areas. Since I was solely responsible for such designations and no discussions were ever had with senior management on any of the countries in question,, I responded "You are a liar" or "You are lying",

!9. Each decision to permit travel is predicated on cost versus benefit to Export-Import Bank. I have denied other employees the opportunity to travel based on the aforementioned determination. I recall denying at least one proposed trip by John Richter, VP to Africa, at least one trip proposed by Ms. Xiomara Creque to Mexico and a trip proposed by Ms. Kostic's Southeast Europe and/or Russia. There have been other such denials consistent with the needs of the Export-Import Bank and budgets consideration.

20. I have authorized international travel for Mr. Charles Barnett, Mr. Brian sant Angelo and Mr. William Hess on official government time and expense. Mr. Barnett accompanied Vice Chairman April Foley on a trip to the Middle East at Ms. Foley's personal request with the cost paid by another Export-Import Bank division. I authorized Mr. Hess and Angelo to so travel. The cost of travel ranged from $3000.00 to 8,000.00. I think it appropriate to point out that Mr. Hess traveled in May of 2005 and sant Angelo in May/June of 2005. This was the first international travel for both, and came in the same month of Ms. Nuskey's first complaint about international travel.



Initials ____

21. I do not recall my having told Ms. Nuskey on October 5, 2004"if you come into this office again you will leave with your head on a platter."

22. I do not recall Ms. Nuskey indicating that she was going to HR and/or EEO. She did say that she was going to see Mr. Emens.

23. The Performance Appraisal I signed on April 5, 2005 did have an overall rating of Excellent. However, it should be noted that the rated period covered the period from initial hire through January, 2005. Ms. Nuskey began reporting to Mr. O'Connor in February of 2005. I had personally not detected any changes in Ms. Nuskey's performance until her actions in May, 2005.

24. Mr. O'Connor was involved in my decision to terminate Ms. Nuskey. I sought his assessment of her performance in the last three months and asked for his opinion and recommendations as to how we should handle the situation. I recall that Mr. O'Connor was not happy and reiterated his consistent effort to train Ms. Nuskey in essentially the same manner he had successfully trained Brain san Angelo. Mr. O'Connor indicated that Ms. Nuskey had seriously misrepresented what was going on. We had two or three meetings about Ms. Nuskey's trip; the last was on May 19, 2005. The decision to terminate Ms. Nuskey was made on May 19, 2005 and Mr. O'Connor was aware that I was going to terminate Ms. Nuskey.



Initials ________

25. I was advised by HR that a probationary employee could be dismissed for any reason including not being a good fit for people in the division.

26. Upon arrival at the meeting of May 20 Ms. Nuskey requested that the Union representative see had brought unannounced to the meeting be allowed to attend. . Mr. Greg DaDameo of HR and who attended the meeting stated that Ms. Nuskey was not a member of the Union and therefore a Union representative's presence was not authorized. Mr. DaDameo advised that another person attending a meeting called by a manager was not in the ordinary course.

27. I did not refuse to allow Ms. Nuskey to retrieve copies of her e-mails from her computer regarding her work performance after being terminated. Once she left my office at 2:00 PM, May 20, 2005, I did not see her again and HR made all decisions about access and communication with Ms. Nuskey.

28. I did hold a staff meeting on May 23, 2005 because I felt that it was appropriate to inform employees in the division that one of their colleagues would not be continued on the staff. I do not recall the exact quote but the statement "The needs of the department and Ms. Nuskey's expectations did not coincide." sounds like what I may have said. I also agree with the statement that Ms. Nuskey had a "misconception of the job for which



Initials

she was hired".

29. I am not aware of any EEO activity Ms. Nuskey participated in prior to this complaint. I did not contact Ms. Patrease Jones-Brown, Director, EEOO regarding Ms. Nuskey before this complaint was filed. I have not been informed by anyone that Ms. Nuskey contacted the EEO Office.

30. I do not know Ms. Nuskey's age; I had thought that she was in her mid thirties and about the same age as Mr. Barnett, perhaps 1-2 years older.

I do not have any other pertinent information to add to this statement.

I have read the foregoing statement consisting of 15 pages, each of which I have initialed, is true and complete to the best of my knowledge and belief. Any corrections that I made have my initials next to the correction. This statement was made of my free will without any threat, promise of immunity or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.



Initials________

I declare under penalty of perjury that the foregoing is true and correct. Executed this

12th day of DECEMBER, 2005.

Signature



Initials__________