EXPORT-IMPORT BANK
OF THE UNITED STATES

June 7, 2006

received
6-26-06

Ms. Sharon Nuskey
2900 Connecticut Avenue, Apt. 126
Washington, DC 20008

Re: EEO Complaint Number EODP 05-02

**FINAL AGENCY DECISION**

On April 10, 2006 you requested a final agency decision in your Equal Employment Opportunity ("EEO") Complaint Number EODP 05-02. Pursuant to 29 C.F.R. § 1614.110, the Export-Import Bank of the United States ("Ex-Im Bank") issues this Final Agency Decision.

**I. Complaint**

On August 30, 2005, pursuant to 29 C.F.R. § 1614.106(e), Ex-Im Bank accepted for investigation your formal discrimination complaint of August 15, 2005. *Investigative Record ("IR") Ex. C(2).*[1] The following agreed-upon issues were investigated:

> Whether [you were] subjected to disparate treatment and harassment based upon sex (female), age (45 years old) and reprisal, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"), when, as you alleged:

[1] On August 19, 2005, Ex-Im Bank issued an Acceptance Letter based upon the August 15, 2005 formal complaint of discrimination. *IR Ex. C(4).* The Acceptance Letter stated that "[i]f you believe your claims have not been correctly identified, please notify [the Director, Equal Opportunity and Diversity Programs] in writing, within 10 calendar days after your receipt of this letter, specifying why you believe the claims have not been correctly identified. If you fail to respond within the specified time frame, the accepted claims will be investigated as identified." On August 30, 2005, you submitted to Ex-Im Bank amendments to the proposed accepted claims. *IR Ex. C(3), August 30, 2005 Letter from Diana J. Vielleux to Patrease Jones-Brown.* All your proposed amendments were accepted by Ex-Im Bank and a new acceptance letter was issued on August 30, 2005. *See IR Ex. C(2).* Thus, the accepted claims are agreed-upon by you and Ex-Im Bank.

1. Your first-level supervisor, Mr. Craig O'Connor, excluded you from important meetings that your younger male colleagues were invited to attend by their supervisors.

2. Your first-level supervisor, Mr. Craig O'Connor, asked you to attend meetings just before they were about to begin, or after they were in progress, leaving you little or no time to prepare.

3. Your first-level supervisor, Mr. Craig O'Connor, failed to inform you about various issues that fell within your program area of responsibility, whereas other supervisors did not appear to do the same with your younger male colleagues.

4. Your first-level supervisor, Mr. Craig O'Connor, limited your exposure to the Bank's Directors.

5. You were not assigned opportunities for international travel as set forth in your position description and as offered to others, to include an arbitrary $1250 limit on your approved travel.

6. You were denied opportunities for career advancement that your three male colleagues had been given.

7. You were subjected to a discriminatory comment by your second-line supervisor, Mr. Michael Forgione, on May 19, 2005, when he told you that you were "much better educated and older" than your three male colleagues, but that you were all hired "at the same level."

8. Your second-line supervisor, Mr. Michael Forgione, spoke to you in a hostile manner, stating on May 19, 2005, "you are a liar," and told you on October 5, 2004, "if you come into this office again you will leave with your head on a platter."

9. Your second-line supervisor, Mr. Michael Forgione, refused your request to have a colleague present at a May 19, 2005 meeting with Mr. Forgione.

10. Your second-level supervisor, Mr. Michael Forgione, terminated your employment with the agency effective on May 20, 2005.

11. Your second-line supervisor, Mr. Michael Forgione, refused your request, upon your termination, to retrieve copies of e-mails from your computer regarding your work performance.

12. Your second-line supervisor, Mr. Michael Forgione, held a staff meeting on May 23, 2005 during which he announced your termination and his reasons for it, and stated that he "could not see the same thing happening to anyone else in the office."

*IR Ex. C(2).*

## II. Findings of Fact

### A. Initial Findings of Fact

You were hired by Ex-Im Bank on August 9, 2004 as a GS-1101-11/10 Business Development Specialist. *IR Ex. E(9).* You were terminated by your second-line supervisor, C. Michael Forgione, Vice-President, International Business Development Division, on May 20, 2005, prior to the end of your one-year probationary period. *IR Ex. C(8)(h).* While employed at Ex-Im Bank, you worked in the Central Europe & Southeast Europe ("SECE") Section. *IR Ex. E(1).* During your employment, your first-line supervisor from August 2004 to January 2005 was Margaret Kostic. *IR Ex. E(3)*; *IR Ex. D*(3) at 1; *IR Ex. D(1)* at 1. From February 2005 to your termination in May 2005, your first-line supervisor was Craig S. O'Connor. *Id.* At all times, Mr. Forgione was your second-line supervisor.

You allege you had three comparators who were colleagues and assigned similar duties for different geographical areas. Charles Barnett was hired by Ex-Im Bank on August 16, 2004 as a GS-1101-11/01 Business Development Specialist assigned to the Asia, Africa, and Middle East Section. *IR Exs. E(1), E(9).* Similarly, William Hess was hired by Ex-Im Bank on August 9, 2004 as a GS-1101-11/01 Business Development Specialist assigned to the regions of Russia, Turkey and the Commonwealth of Independent States. *IR Exs. E(1), E(9).* Finally, Brian Sant Angelo was hired by Ex-Im Bank on July 26, 2004 as a GS-1101-09/01 Business Development Specialist assigned to the Americas Section. *IR Exs. E(1), E(4), E(9).* Craig O'Connor, your immediate supervisor from February 2005 to May 2005, previously supervised Mr. Sant Angelo before Mr. O'Connor was transferred to the SECE Regional Director position, and became your supervisor. *IR Ex. E(3).*

### B. Findings of Fact with Regard to Complaint Allegations

With regards to your allegations, Ex-Im Bank makes the following findings of fact:

1. **Your first-level supervisor, Mr. Craig O'Connor, excluded you from important meetings that your younger male colleagues were invited to attend by their supervisors.**

You allege that shortly after Mr. Craig O'Connor became your first-level supervisor, you "began to be excluded from important meetings that [your] younger male colleagues and supervisors were invited to attend. In these meetings, matters that were relevant to [your] areas of responsibility were discussed without [your] being present." *IR Exs. D(1)* at 1-2; *D(17)* at 3-4. Specifically, you contend that you "were not invited to attend the overwhelming majority of SECE regional meetings while [you] worked with Mr. O'Connor." *IR Ex. D(17)* at 1.

On or about May 11, 2005, you informed Mr. Forgione of this allegation against Mr. O'Connor. *Id.* Mr. Forgione raised the issue with Mr. O'Connor who maintained that "you had been involved in essentially all meetings." *IR Ex. D(2)* at 4. Moreover, meetings were posted on the Division calendar and he expected you to "inquire about the meetings when you saw them on the calendar." *IR Ex. D(2) at 4*. You allege you did not "have access to the IBD departmental calendar so [you] would not have any notice so that [you] could inquire about any of the meetings with Mr. O'Connor." *IR Ex. D(2) at 4*. However, no evidence exists demonstrating that Mr. O'Connor knew you lacked or prevented you from having access to said calendar. Also, Mr. O'Connor states that he "tried to take [you] to all meetings, but on some occasions [he] was invited to attend meetings individually." *IF Ex. D(3)* at 2. This is consistent with the testimony of Mr. Forgione, Division Vice-President, who states that:

> Because a meeting occurs regarding Southeast and Central Europe it does not mean that both persons (O'Connor and Nuskey) assigned to that region must or even should attend. There are many reasons why this is true including the need to cover other office responsibilities. When [he has] a meeting with a representative from a region, [Mr. Forgione] do[es] not always ask for the staff to sit in on that meeting. [His] superiors certainly do not invite [Mr. Forgione] to all meetings dealing with matters over which [he has] responsibility nor do[es he] expect them to.

*IR Ex. D(2)* at 4-5.

You allege that you raised certain complaints with Mr. Forgione on May 11, 2005, to which he responded, "You're right. You are always so aggressive. I can't believe it's taken you so long to say anything." *IR Ex. D(1) at 2*. Mr. Forgione denies he made this comment. *IR Ex. D(2)* at 7. No witnesses to the alleged statement exist. Moreover, Mr. O'Connor asserts that he treats his current male subordinate, Mr. Vranich, in the same manner in which he treated you. *IR Ex. D(3)* at 2.

The investigative record does not establish by a preponderance of the evidence that from February 2005 to May 2005, Mr. O'Connor "excluded you from important meetings that your younger male colleagues were invited to attend by their supervisors." The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

2. **Your first-level supervisor, Mr. Craig O'Connor, asked you to attend meetings just before they were about to begin, or after they were in progress, leaving you little or no time to prepare.**

You allege that "[o]n several occasions, [you were] asked to attend [] meetings, but only after they were already in progress, leaving [you] little time to prepare so [you] could make a meaningful contribution." *IR Ex. D(1)* at 1-2. You also allege that "Mr. O'Connor told [you] he 'forgot' to put things on the calendar" and that "[o]n a couple of occasions, he invited [you] to attend a meeting only after [you] inquired about it on [your] own initiative." *IR Ex. D(17)* at 4. With regard to a May 18, 2005 meeting with "the Mayor of Karlovo, Bulgaria, Mr. O'Connor invited [you] ten minutes before the meeting was about to begin." *IR Ex. D(17)* at 4, 13. Also, you were invited to a May 11, 2005 meeting with Alcatel, 40 minutes after it began. *Id.* Concerning your above-mentioned allegation, Mr. O'Connor states that "it could have happened as an honest mistake. Generally, when [he] was informed of a meeting, [he] would check with [you] to verify [your] availability before scheduling the meeting and placing it on the calendar. [He] use[s] the same procedure with [his current subordinate] Mr. Vranich." *IR Ex. D(3)* at 2.

The investigative record does not establish by a preponderance of the evidence that, from February 2005 to May 2005, Mr. O'Connor "asked you to attend meetings just before they were about to begin, or after they were in progress, leaving you little or no time to prepare." The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

3. **Your first-level supervisor, Mr. Craig O'Connor, failed to inform you about various issues that fell within your program area of responsibility, whereas other supervisors did not appear to do the same with your younger male colleagues.**

You allege that "Mr. O'Connor also regularly failed to inform [you] about various issues that fell within [your] program responsibility, whereas other supervisors did not appear to do the same with [your] younger male colleagues." *IR Ex. D(1) at 2.* For example, you claim you were uninformed about SECE department activities and "excluded from nearly all SECE meetings with Mr. O'Connor and, consequently, from information about prospective transactions

that were a part of [your] responsibilities." *Id.*; *IR Ex. D(17)* at 4. You rely on your desk calendar, not a part of the investigative record, as corroborating evidence of your allegations in this regard. *Id.* In your May 11, 2005 meeting, Mr. Forgione speculated that you were uninformed about SECE departmental activities because of your lack of proximity to Mr. O'Connor's office. *IR Ex. D(2)* at 5. He stated that you and Mr. O'Connor needed to make a better effort to communicate; subsequently, he spoke with Mr. O'Connor and told him that "he needed to put forth more effort to communicate" with you. *Id.*

The investigative record does not establish by a preponderance of the evidence that, from February 2005 to May 2005, "Mr. Craig O'Connor, failed to inform you about various issues that fell within your program area of responsibility, whereas other supervisors did not appear to do the same with your younger male colleagues." The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

4. **Your first-level supervisor, Mr. Craig O'Connor, limited your exposure to the Bank's Directors.**

You allege that:

> While the Directors' travel schedules can sometimes be an issue, [you were] being excluded from meetings that Mr. O'Connor was having with them when they were in the office. The Business Development Specialists were hired to support the Directors. Without having access to them, [you were] inhibited in [your] ability to do [your] job. Mr. Forgione told [you] that the Directors speak favorably about Mr. Charles Barnett and Mr. William Hess, but they did not speak at all about Mr. Brian Sant Angelo and [you]. The problem was that they could not comment in any way about [your] performance because [you were] not exposed to them and therefore [you were] "off the radar screen."

*IR Ex. D(17)* at 5.

The SECE Division's interaction with the Board of Directors is generally limited to Director Linda Conlin. *IR Ex. D(3)* at 2. During the period of January 27, 2005 to May 20, 2005, Mr. O'Connor had six to seven meetings with Director Conlin. *Id.* According to Mr. O'Connor, "[s]everal of these meetings were related to environmental issues; thus [you were] not involved or invited to attend." *Id.* at 3. Furthermore, you were invited to an OPIC Southeast Europe Fund meeting (at which Director Conlin was present) that you did not attend. *Id.* at 2-3. According to Director Conlin, she interacted with you approximately

six times during your tenure at the Bank. *IR Ex. D(5)* at 2. She also states that "[d]epending upon the issue, [she] similarly interacted with different employees in [the International Business Development] Division. [Her] interaction with [you] was the same as that with any staff members of IBD involved with regional business development activities, regardless of their sex or age." *Id.*

The investigative record does not establish by a preponderance of the evidence that, from February 2005 to May 2005, Mr. O'Connor "limited your interactions with Ex-Im Bank Directors." The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

5. **You were not assigned opportunities for international travel as set forth in your position description and as offered to others, to include an arbitrary $1250 limit on your approved travel.**

You allege that you were "not assigned opportunities for international travel as set forth in your position description and as offered to others, to include an arbitrary $1250 limit on your approved travel." *IR Ex. C(2)*; *IR Ex. E(1)* at 2. Contrary to your allegation, your position description does not mention the word "travel." *IR Ex. E(4)*. Furthermore, on May 11, 2005, Mr. Forgione reminded you:

> [at your] initial interview and [] numerous occasions in divisional meetings that the four (new) positions were created in large part to assist in serving the Directors and that [you] and the other hires would be expected to do the majority of the 'grunt work' generated in the division as the most junior people. International travel was not given as an immediate job requirement or in any way a 'perk' of employment.

*IR Ex. D(2)* at 6.

With regards to your allegation that your alleged comparators were offered opportunities for international travel, which you were denied, the evidence demonstrates as follows: from May 12, 2005 to May, 20, 2005, Charles Barnett accompanied Vice Chair April Foley on a trip to Jordan at Ms. Foley's personal request and with the cost paid by a separate Ex-Im Bank Division. *IR Ex. D(2)* at 11; *IR Ex. E(14)*. From April 16, 2004 to April 27, 2004, William Hess traveled to Kazakhstan and Azerbaijan for the purpose of participating in a trade finance conference, meetings with existing and potential clients of the Bank, conducting Bank marketing activities and to better understand the competitive environment that the Bank faced in his markets. *IR Ex. D(9)* at 9; *IR Ex. E(15)*. Finally, from May 8, 2005 to May 14, 2005, Brian Sant Angelo traveled with a female Business Development Specialist, Xiomara Creque, to

seek business development opportunities and to meet with Mexican companies and financial institutions. *IR Ex. D(10)* at 2; *IR Ex. D(2)* at 11; *IR Ex. D(1)* at 11; *IR Ex. D(1)(F)*. The total cost of travel for Charles Barnett, William Hess and Brian Sant Angelo was $9,325.45, $11,613.45, and $1,790.00, respectively. *IR Ex. D(1)(F)*. Brian Sant Angelo, who was supervised by Mr. O'Connor from July 26, 2004 to the end of January 2005, did not travel while under Mr. O'Connor's supervision. *See IR Ex. D(10); IR Ex. D(1)(f).*

You received an all expense-paid invitation to a U.S. Department of State approved study/information tour to Germany ("Germany Tour"). *IR Ex. D(1)* at 2. You asked Mr. Forgione if you could attend and indicated that it would be paid for by another government agency and would help your individual career development. *IR Ex. D(2)* at 8. Mr. Forgione discussed the trip with John Emens, Deputy Head, Export Finance Group, and thereafter approved your attendance. *Id.* Germany was not in your SECE regional portfolio. *IR Ex. D(17)* at 10-11. A day later, you informed Mr. Forgione of your desire to attend the European Bank for Reconstruction Development Annual Meeting and Business Forum ("EBRD Conference") in Serbia-Montenegro. *IR Ex. D(2)* at 8. Mr. Forgione, after speaking with Mr. Emens, approved your trip to the EBRD Conference even though he determined that you "were a junior officer and Ex-Im Bank would not realize any substantive benefit from your presence at the meeting." *Id.* at 8-9. Mr. Forgione thought "since [you] were there on the [Germany Tour], which was already being paid for why not attend the EBRD [Conference]?" *Id.* at 9. Typically, Senior Vice-Presidents, Directors or, occasionally, Regional Managers, attend the EBRD Conference. *Id.* In reference to the EBRD Conference, Mr. Forgione "came into [your] office and said 'I can do this' and asked [you] to submit a list of goals [you] aimed to accomplish." *IR Ex. D(1)* at 3. He "advised [you] to proceed with your travel plans, which [you] did, and [you] became an official member of the U.S. delegation to the EBRD [Conference]." *Id.*

Thereafter, Mr. Forgione was made aware or realized that the two events were separated by a four-day gap; Mr. Forgione was under the impression that the EBRD Conference was one day after the Germany Tour. *IR Ex. D(2)* at 8-9. You also proposed traveling to Croatia at that time. *Id.* Mr. Forgione denied your attendance at the EBRD Conference because "[Director Linda Conlin] would be imminently traveling to that region [in July] and that none of the countries [you] had proposed were in [the Bank's] strategic business plan." *Id.* Also, Mr. Forgione cited budget constraints. To attempt to resolve the situation, Mr. Forgione told you that you could travel to the EBRD Conference if your costs would not exceed $1250 under the assumption that you would return to the US for the four-day gap period and then proceed on the second trip. *Id.* Thereafter, Mr. Forgione received a call from JT McMullen, Director, Administration & Security Division stating that you "had been spending time in the Travel Office making numerous inquiries including the need to take personal leave to cover the gap between events." *Id.* at 10. Mr. Forgione felt

that you were "waging a relentless campaign to travel without regard to well-planned IBD strategies specifically approved by senior management" and that you "could not justify the time [you] were spending organizing a trip with such little organizational value." *Id.* You also met with Mr. Forgione and he informed you that "Serbia-Montenegro was [not] an important market and stated that [you] did not need to communicate with anyone there"; you disagreed with him and attempted to instruct him otherwise. *IR Ex. D(1)* at 3. According to Linda Conlin, Serbia-Montenegro was not one of the Bank's tier-one countries for priority markets. *IR Ex. D(5)* at 3. Furthermore, neither Serbia-Montenegro nor Croatia was part of SECE's business development strategic plan. *IR Ex. D(3)* at 4. The latter was "carefully developed to focus on countries where Ex-Im Bank could get the greatest return on its investment in travel resources and staff time, namely Romania, Bulgaria and Albania." *Id.*

Mr. Forgione informed you that you could not go to the EBRD Conference; you were still permitted to attend the German study/information tour. *Id.* Previously, Mr. Forgione denied a trip proposed by male Regional Director John Richter. *IR Ex. D(2)* at 11. Also, during the time period in question – February 2005 to May 2005 – Mr. O'Connor did not travel internationally. *IR Ex. D(3)(A).*

The investigative record does not establish by a preponderance of the evidence that, "you were not assigned opportunities for international travel as set forth in your position description and as offered to others." You initially raised this allegation in your May 11, 2005 meeting with Mr. Forgione. At that time, the only alleged comparator who had completed international travel was William Hess, from April 16, 2004 to April 27, 2004. Brian Sant Angelo was in travel for his May 8, 2005 to May 14, 2005 trip with female Business Development Specialist, Xiomara Creque. Charles Barnett had not yet traveled; his trip concluded on your termination date, May 20, 2005. While your alleged comparators traveled internationally by your termination date, and you had not, no evidence suggests that you were "not assigned opportunities . . . as offered to others." The evidence does not demonstrate that during your employment, the opportunity for international travel for Business Development Specialists was available in SECE, as it was in other Regional Divisions. While working in SECE under Ms. Kostic – whom you do not allege discriminated against you – you did not travel internationally. After Mr. O'Connor became Regional Director of SECE and your supervisor, he did not travel internationally. Furthermore, the evidence demonstrates that Mr. Forgione gave you the opportunity, and you were planning, to travel internationally, prior to your termination. The fact that you did not ultimately travel internationally for Ex-Im Bank is irrelevant to your allegation.

**A preponderance of the evidence in the investigative record substantiates your allegation to the extent you allege that a $1250 limit was placed upon**

**your approved international travel that was not placed upon your alleged comparators' international travel.**

6. **You were denied opportunities for career advancement that your three male colleagues had been given.**

You allege that from February 2005 to May 2005, you were "denied opportunities for career advancement that your three male colleagues were given." *IR Ex. D(1)* at 2. By "career opportunities" you mean "participating in SECE meetings, being informed about SECE activities so [you] could knowledgably reply to questions from Bank staff and actual and prospective clients, and traveling to the markets for which [you were] responsible for business development." *IR Ex. D(17)* at 7. This allegation is duplicitous with your allegations that based upon your age and gender, from February 2005 to May 2005, Mr. Craig O'Connor "excluded you from important meetings that your younger male colleagues were invited to attend by their supervisors"; "asked you to attend meetings just before they were about to begin, or after they were in progress, leaving you little or no time to prepare"; "failed to inform you about various issues that fell within your program area of responsibility, whereas other supervisors did not appear to do the same with your younger male colleagues"; and "did not assign to you opportunities for international travel as set forth in your position description and as offered to others, to include an arbitrary $1250 limit on your approved travel." *IR Ex. C(2)*. Because your aforementioned claim is duplicitous, it fails to state a claim upon which relief may be granted. Please see the respective sections of this FAD corresponding to the individual allegations above.

7. **You were subjected to a discriminatory comment by your second-line supervisor, Mr. Michael Forgione, on May 19, 2005, when he told you that you were "much better educated and older" than your three male colleagues, but that you were all hired "at the same level."**

You allege that "Mr. Forgione . . . told [you] **[you were]** 'much better educated and older than[your] three male colleagues but that [you] were all hired 'at the same level.'" *IR Ex. C(2)* (emphasis added). This is markedly different than the statements provided in your affidavits. See *IR Exs. D(17)* at 13 ("Mr. Forgione commented about [your] age and sex in the context of [your] performance two days before terminating [you] saying, '**You seem to think** you are so much older and better educated than your male colleagues'") (emphasis added); *IR Ex. D(1)* at 3 ("During the discussion, Mr. Forgione remarked that **[you]** '**seemed to think** that [you were] much better educated and older than [your] three male colleagues'") (emphasis added).

Mr. Forgione denies making any such statements and had "thought [you] were in [your] mid-thirties and about the same age as Mr. Barnett, perhaps one to

two years older." *IR Ex. D(2)* at 14. You allege this is implausible because "Mr. Forgione had [your] resume . . . as well as numerous personnel documents . . . noting your date of birth in the upper right hand corner" and "he wrote about [your] many years of professional experience to secure [your] 'Superior Qualifications' hiring status." *IR Ex. D(17)* at 12-13. No witnesses to the alleged statement exist.

The investigative record does not establish by a preponderance of the evidence that, on May 19, 2005, Mr. Forgione "told you that you were 'much better educated and older' than your three male colleagues, but that you were all hired 'at the same level.'" The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

8. **Your second-line supervisor, Mr. Michael Forgione, spoke to you in a hostile manner, stating on May 19, 2005, "you are a liar," and told you on October 5, 2004, "if you come into this office again you will leave with your head on a platter."**

You allege that on May 19, 2005, in the context of a discussion with Mr. Forgione concerning a revised travel order and your requested travel to the Germany Tour and EBRD Conference, Mr. Forgione said "you are a liar." *IR Ex. D(1)* at 3. Mr. Forgione admits he told you "you are a liar" or "you are lying." *IR Ex. D(2)* at 11. Mr. Forgione made this remark when you stated that you were informed that the Division's Strategic Plan would soon be changed designating the countries to which you had proposed travel, Germany and Serbia-Montenegro, as secondary target markets, allowing travel to said countries. *IR Ex. D(2)* at 11. Mr. Forgione was solely responsible for such designations and no discussions were ever had with senior management on any of the countries in question. *Id.*

You also allege that "on October 5, 2004 when [you] made an inquiry at the request of Ms. Kostic, Mr. Forgione unreasonably and angrily told [you] that "[i]f you [came] into [his] office again, you [would] leave with your head on a platter." *IR Ex. D(1)* at 4; *IR Exs. D(17)* at 11. Mr. Forgione does not recall making this alleged statement and no witnesses to it exist. *IR Ex. D(2)* at 12.

**A preponderance of the evidence in the investigative record supports your contention that, on May 19, 2005, Mr. Forgione stated to you, "you are a liar."** The investigative record does not establish by a preponderance of the evidence that on October 5, 2004, Mr. Forgione stated to you, "if you come into this office again you will leave with your head on a platter." The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

9. **Your second-line supervisor, Mr. Michael Forgione, refused your request to have a colleague present at a May 19, 2005 [sic] meeting with Mr. Forgione.**

You allege that you were called into a May 20, 2005 meeting with Mr. Forgione and asked him "if a colleague could accompany [you] to the meeting because [you] were shaken from the previous meeting [of May 19, 2005]"; you contend Mr. Forgione denied your request. *IR Ex. D(1)* at 4.

At the May 20, 2005 meeting, you brought with you unannounced, an American Federation of Government Employees ("AFGE") Local 1950 representative. *IR Ex. D(2)* at 13. Mr. Greg DaDamio, Lead Human Resources Specialist, in attendance at the meeting, stated that you were not a member of the Union and therefore a Union representative's presence was not authorized. *Id.*; *IR Ex. D(7)* at 3. Mr. DaDamio advised that another person attending a meeting called by a manager was not in the ordinary course of business and the representative was asked to leave. *Id.*

The investigative record does not establish by a preponderance of the evidence that, on May 20, 2005, Mr. Forgione "refused your request to have a colleague present" at your termination meeting. The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

10. **Your second-level supervisor, Mr. Michael Forgione, terminated your employment with the agency effective on May 20, 2005.**

You allege that Mr. Forgione terminated your employment effective May 20, 2005. *IR Ex. D(1)* at 4. Mr. Forgione admits the same and adds that "Mr. O'Connor was involved in my decision to terminate Ms. Nuskey." *IR Ex. D(2)* at 12.

Mr. Forgione provided you an overall "excellent" performance rating on your April 5, 2005 Annual Performance Appraisal and did not "detect any change[s] in [your] performance until [your] actions in May 2005." *IR Ex. D(2)* at 12. In deciding to terminate your employment, Mr. Forgione sought from Mr. O'Connor his "assessment of [your] performance in the last three months and asked for his opinion and recommendations as to [your performance]." *IR Ex. D(2)* at 12. Mr. O'Connor was not happy and reiterated his consistent effort to train [you] in essentially the same manner he had successfully trained Brian Sant Angelo." *Id.* Furthermore, Mr. O'Connor stated that you "seriously misrepresented" what occurred with regard to your proposed trips to the Germany Tour and the EBRD Conference. *Id.* Mr. Forgione was advised by the Office of Human Resources that as a probationary employee, you could be terminated "for any reason including not being a good fit for people in the division." *Id.* at 13.

You first initiated contact with Ex-Im Bank's Office of Equal Opportunity and Diversity Programs ("EODP") on May 17, 2005 concerning issues related to your international travel. *IR Ex. B(7)*. You exchanged a number of E-mails with Patrease Jones-Brown, EODP Director, between May 17, 2005 and May 20, 2005. *IR Ex. D(16)(b)*. However, prior to terminating you, neither Mr. Forgione nor Mr. O'Connor were aware of any activity in which you participated with the EODP office. *IR Ex. D(2)* at 14; *IR Ex. D(3)* at 4.

**A preponderance of the evidence in the investigative record supports your contention that, Mr. Forgione "terminated your employment effective on May 20, 2005."**

11. **Your second-line supervisor, Mr. Michael Forgione, refused your request, upon your termination, to retrieve copies of e-mails from your computer regarding your work performance.**

You allege that:

> On May 20, 2005, "[b]efore I was escorted out of the building, I asked Mr. Forgione if I could retrieve and print emails that were maintained on my work computer. The emails included positive feedback that others . . . had given me about my performance during my probationary period. There were also other emails exchanged with Mr. Forgione and Mr. O'Connor, specifically relating to my belief that I was being discriminated against based upon my gender and age. Mr. Forgione flatly denied my request to retrieve the emails.

*IR Ex. D(1)* at 5.

Mr. Forgione states that he "did not refuse to allow [you] to retrieve copies of [your] e-mails from [your] computer regarding [your] work performance after being terminated. Once [you] left [Mr. Forgione's office] at 2:00 PM, May 20, 2005, [he] did not see [you] again and HR made all the decisions about access and communication . . ." *IR Ex. D(2)* at 13.

The investigative record does not establish by a preponderance of the evidence that, on May 20, 2005, Mr. Forgione "refused your request, upon your termination, to retrieve copies of e-mails from your computer regarding your work performance." The only evidence in the record to substantiate such a charge is your sole contention, unsupported by any documentary or testimonial evidence.

12. **Your second-line supervisor, Mr. Michael Forgione, held a staff meeting on May 23, 2005 during which he announced your termination and his reasons for it, and stated that he "could not see the same thing happening to anyone else in the office."**

You allege that:

> Shortly after my termination I learned from several of my former co-workers . . . that Mr. Forgione called an all-hands staff meeting at 9:30 AM on Monday, May 23, 2005 with the sole purpose of announcing my termination . . . . Mr. Forgione specifically stated that I had been "terminated" because I was "not a good fit" for the Bank. He continued by stating that the needs of the department and my expectations did not coincide. According to Mr. Forgione, I had a "misperception of the job" that I was hired to fill. He also said that he "could not see the same thing happening to anyone else in the office."

*IR Ex. D(1)* at 5. At the meeting, Brian Sant Angelo witnessed Mr. Forgione state that "he did not forsee future departures of staff in a similar manner." *See IR Ex. D(10)* at 5. Mr. William Hess, also present at the meeting, witnessed Mr. Forgione state that you had a "'misperception of the job' for which [you] were hired to fill" and that he "could not see this same thing happening to anyone else in the office." *IR Ex. D(9)* at 11.

Mr. Forgione states that he held the May 23, 2005 staff meeting "because [he] felt that it was appropriate to inform employees in the division that one of their colleagues would not be continued on the staff." *IR Ex. D(2)* at 13. He admits he stated at the meeting that "the needs of the department and [your] expectations did not coincide" and that you had a "misconception of the job for which [you were] hired." *Id.* at 13-14.

**A preponderance of the evidence in the investigative record supports your contention that "Mr. Forgione held a staff meeting on May 23, 2005 during which he announced your termination and his reasons for it, and stated that he 'could not see the same thing happening to anyone else in the office.'"**

## III. Conclusions of Law

A preponderance of the evidence in the investigative record substantiates four factual allegations: 1) a $1250 limit was placed upon your approved international

travel that was not placed upon your alleged comparators' international travel; 2) on May 19, 2005, Mr. Forgione stated, "you are a liar"; 3) effective May 20, 2005, Mr. Forgione terminated your employment; 4) Mr. Forgione held a staff meeting on May 23, 2005 during which he announced your termination and his reasons for it, and stated that he "could not see the same thing happening to anyone else in the office." You alleged that these actions constitute disparate treatment and harassment based upon sex (female), age (45 years old) and reprisal. *IR Ex. C(2)*.

## A. Disparate Treatment

### 1. *Prima Facie* Analysis

In lieu of direct evidence of discrimination, a complainant alleging disparate treatment on the bases of gender and age must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006); *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). If a complainant succeeds in proving the *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Lemmons v. Georgetown University Hosp*., --- F.Supp.2d ----, 2006 WL 1174444 at *7 (D.D.C. May 4, 2006) (*citing Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). Should the employer carry this burden, the complainant must then have the opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Id*.

### 2. Adverse Actions Other Than Termination

You have satisfied the first prong of the *prima facie* analysis due to your status as a woman and individual over the age of 40. With regard to the second requirement – that you suffered an adverse employment action – the record does not substantiate any adverse employment action, save termination.

The alleged actions are not ultimate employment decisions and are too trivial to constitute adverse employment actions for purposes of discrimination law. *Glenn v. Williams*, 2006 WL 401816 at *24 (D.D.C. 2006); *Everson v. Medlantic Healthcare Group*, 414 F.Supp.2d 77, 85 (D.D.C. 2006); *see also Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Not everything that makes an employee unhappy is an actionable adverse action because, if that were the case, then trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit").

In determining whether a challenged action constitutes an adverse employment action, a court should focus on "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating," not intermediate decisions "having no immediate effect upon employment decisions." *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir.1997); *Burton v. Batista*, 339 F.Supp.2d 97, 110 (D.D.C. 2004). Employer actions short of outright firing or non-selection for promotion can be adverse, but not all lesser actions count for purposes of liability. *Burton*, 339 F.Supp.2d at 110; *see Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). Thus, "[t]o establish an adverse personnel action in the absence of diminution in pay or benefits, a complainant must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.'" *Stewart*, 275 F.3d at 1134 (*quoting Brown*, 199 F.3d at 457); *Burton*, 339 F.Supp.2d at 110. Indeed, an "employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Id.* (*quoting Walker v. WMATA*, 102 F.Supp.2d 24, 29 (D.D.C. 2000)); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes **a significant change in employment status**, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") (emphasis added); *Brown*, 199 F.3d at 457 (plaintiff **must show "objectively tangible harm"**) (emphasis added); *Glenn v. Williams*, 2006 WL 401816 at *24 (D.D.C. 2006); *Burton*, 339 F.Supp.2d at 110; *Raymond v. U.S. Capitol Police Bd.*, 157 F.Supp.2d 50, 56 (D.D.C. 2001) (requiring "tangible change in responsibilities or working conditions that constitutes a material employment disadvantage"). For example, changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary or work hour changes. *Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549, 1556-57 (D.C.Cir.1997); *Amiri v. Stoladi Property Group*, 407 F.Supp.2d 119, 125-6 (D.D.C. 2005). Purely subjective injuries, such as dissatisfaction with reassignment, public humiliation or loss of reputation, or unhappiness over assigned duties are not adverse actions. *Forkkio*, 306 F.3d at 1130-31; *Burton*, 339 F.Supp.2d 97 at 110. Therefore, not "all personnel decisions with negative consequences for the employee" qualify as legally cognizable adverse actions. *Runkle v. Gonzales*, 391 F.Supp.2d 210, 222 (D.D.C. 2005); *Ware v. Billington*, 344 F.Supp.2d 63, 71 (D.D.C. 2004) (citing *Forkkio*, 306 F.3d at 1130-31).

The substantiated factual allegations do not rise to the level of cognizable adverse employment actions. A $1250 limit placed on your international travel does not constitute an adverse employment action. *Murray v.*

*Chicago Transit Authority*, 252 F.3d 880 (7th Cir. 2001) (isolated and relatively minor actions that a corporate senior vice-president of legal affairs complained of, including president's refusal to approve her travel plan to conference, did not constitute 'tangible employment actions'); *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (denial of discretionary reimbursement for travel and lodging expenses at seminar not an adverse employment action).

The fact that Mr. Forgione made two comments you subjectively perceive to be negative – calling you a "liar" on May 19, 2005 and announcing your termination and the reasons for it to staff on May 23, 2005 – does not constitute adverse employment action. First, the May 23, 2005 comment occurred after your May 20, 2005 termination and thus, cannot constitute an adverse employment action. Second, Mr. Forgione's "liar" comment is not significant enough to state a claim. For verbal comments to rise to the level of adverse employment action, the conduct must be so egregious as to alter the conditions of employment. *Childers v. Slater*, 44 F.Supp.2d 8, 20 (D.D.C.1999) (*quoting Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 252 (D.D.C.1995)); *see also Everson*, 414 F.Supp.2d 77, 84 (D.D.C. 2006) ("[a]lthough Robinson may have felt that Manselle's comments were inappropriate, unjustified, and embarrassing, as previously explained, 'not everything that makes an employee unhappy is an actionable adverse action'"). The United States District Court for the District of Columbia addressed negative remarks as adverse employment actions in *Hussain v. Principi*, 344 F.Supp.2d 86, 106-107 (D.D.C. 2004) finding that:

> Plaintiff alleges that Dr. Barth "made numerous threats to Dr. Hussain regarding his employment." Specifically, he "asked Dr. Hussain to quit" and told Dr. Hussain he would be "kept in a box." The only support provided by plaintiff for these assertions is his own affidavit. Even assuming Dr. Hussain is accurately reporting the conversations, they do not constitute adverse actions. For verbal "comments to rise to the level of adverse action, the conduct must be so egregious as to alter the conditions of employment." *Henry v. Guest Servs.*, 902 F.Supp. 245, 252, n. 9 (D.D.C. 1995); *see generally, Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996) (employer's comment that plaintiff could quit if unhappy with the job did not constitute a constructive discharge); *Williams v. City of Kansas City*, 223 F.3d 749, 754 (8th Cir.2000) (ostracism does not rise to the level of an actionable adverse action).

*Hussain*, 344 F.Supp.2d at 106-107 (internal citations omitted); *see also Santa Cruz v. Snow*, 402 F.Supp.2d 113, 126 (D.D.C. 2005) ("Even performance evaluations that are unequivocally negative are not necessarily adverse actions when they do not affect the employment discrimination plaintiff's salary, benefits, work duties, or other material conditions of employment") (*quoting Brown*, 199 F.3d at 458 (internal quotation marks omitted)).

The limitation placed on your travel and the remarks by Mr. Forgione were not significant changes in your employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Ellerth*, 524 U.S. at 761. No objectively tangible harm resulted from the aforementioned actions. *Brown*, 199 F.3d at 457; *Burton*, 339 F.Supp.2d at 110; *Raymond*, 157 F.Supp.2d at 56. Thus, your substantiated factual allegations fail to demonstrate a *prima facie* case of disparate treatment based upon age and/or gender, because they are not adverse employment actions under Title VII or the ADEA. Furthermore, even if the substantiated conduct constitute cognizable adverse employment actions, the investigative record fails to demonstrate that said actions give rise to an inference of discrimination, the third prong of *prima facie* test. *Chappell-Johnson*, 440 F.3d at 488; *Brown*, 199 F.3d at 452. Finally, beyond the *prima facie* requirements, Ex-Im Bank articulated legitimate, nondiscriminatory reasons for its actions; a preponderance of the evidence in the investigative record does not substantiate that such reasons were pretexts for discrimination. *Lemmons*, 2006 WL 1174444 at *7 (*citing Burdine*, 450 U.S. at 252-53).

3. **Termination**

A preponderance of the evidence in the investigative record demonstrates that you are a protected class member and that you were subjected to an adverse employment action (termination), satisfying the first two prongs of a *prima facie* disparate treatment analysis under Title VII and the ADEA. However, the evidence fails to substantiate that "the unfavorable action gives rise to an inference of discrimination." *Chappell-Johnson*, 440 F.3d at 488; *Brown*, 199 F.3d at 452.

A complainant may establish an inference of discrimination "by demonstrating that she was treated differently from similarly situated employees who are not part of [her] protected class." *Lemmons*, 2006 WL 1174444 at *8 (*citing George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (citations omitted)); *see also Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). Alternately, a complainant may make a showing that the adverse employment action "was not attributable to [a] common, legitimate reason[ ] . . . such as performance below the employer's expectations." *Lemmons*, 2006 WL 1174444 at *8 (*citing George*, 407 F.3d. at 415). In *Ramey v. Potomac Elec. Power Co.*,

2006 WL 1102836 (D.D.C. March 31, 2006), the terminated plaintiff failed to demonstrate his termination gave rise to an inference of discrimination because:

> Plaintiff is not only unable to demonstrate that he was terminated because of his race, he does not even allege facts that would support this being the case. Nowhere in his Amended Complaint does plaintiff allege that others who were similarly situated, i.e., PEPCO employees who were found to be intoxicated at work and then terminated for not completing an approved rehabilitation program for drugs and alcohol were or would be treated any differently if they were of another race. Plaintiff is thus unable to establish that his termination gives rise to an inference of discrimination. As such, plaintiff cannot make out a *prima facie* case of race discrimination, and his claim must be dismissed.

*Ramey*, 2006 WL 1102836 at *4 (internal citations omitted). Similarly, while you maintain that you were terminated due to your age and gender, and others were not, you have not alleged, and no evidence exists, that under similar circumstances, i.e., your dispute with Mr. Forgione over travel-related issues, your alleged comparators would not have been terminated.[2] Additionally, you have not provided any other evidence from which to infer gender or age bias. Thus, the fact that you were terminated does not alone substantiate a *prima facie* case of disparate treatment under Title VII or the ADEA. Furthermore, beyond the *prima facie* requirements, Ex-Im Bank articulated legitimate, nondiscriminatory reasons for its actions; a preponderance of the evidence in the investigative record does not substantiate that such reasons were pretexts for discrimination. *Lemmons*, 2006 WL 1174444 at *7 (*citing Burdine*, 450 U.S. at 252-53).

## B. Harassment/Hostile Work Environment

### 1. *Prima Facie* Analysis

Title VII prohibits discrimination that creates a hostile work environment if the "discriminatory intimidation, ridicule, and insult" is sufficiently abusive to affect a "term, condition, or privilege" of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)

---

[2] A complainant who attempts to make out a *prima facie* case on this basis bears the burden of proving that proffered comparators are in fact similarly situated to the complainant. *Nichols v. Truscott*, --- F.Supp.2d ----, 2006 WL 808066 at *5 (D.D.C. March 30, 2006) (citing *Holbrook*, 196 F.3d at 261("A plaintiff must also demonstrate that 'all of the relevant aspects of her employment situation were 'nearly identical' to those of the male' employee").

(*quoting Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Nichols v. Truscott*, --- F.Supp.2d ----, 2006 WL 808066 at *8 (D.D.C. March 30, 2006). To make out a *prima facie* case of hostile work environment, a complainant must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on complainant's membership in the protected class; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take any remedial action. *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2000) (*citing Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir.1997)); *Nichols*, 2006 WL 808066 at *8; *see also Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).

2. **Actions Other Than Termination**

As with disparate treatment, you have satisfied the first prong of the *prima facie* analysis due to your status as a woman and individual over the age of 40. However, with the exception of termination allegation, a preponderance of the evidence in the investigative record fails to demonstrate that you were subjected to unwelcome harassment, the second prong of the harassment *prima facie* scheme. In determining whether an environment is sufficiently hostile or abusive to support a claim, courts are to look at "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (*quoting Harris*, 510 U.S. at 23); *Nichols*, 2006 WL 808066 at *8. Only in rare and extreme circumstances will one incident be held to create a hostile work environment. *Ramey*, 2006 WL 1102836 at fn. 8; *See Tatum v. Hyatt Corp.*, 918 F.Supp. 5, 7 (D.D.C.1994). Hostile work environment claims are not meant to set a general code for the workplace; rather a workplace environment becomes hostile "only when offensive conduct permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Ramey*, 2006 WL 1102836 at fn.8 (*citing Stewart*, 275 F.3d at 1133).

Your allegation that Mr. Forgione held a staff meeting on May 23, 2005 during which he announced your termination and his reasons for it, and stated that he "could not see the same thing happening to anyone else in the office" cannot serve as evidence of workplace harassment as it occurred after your termination. Furthermore, the monetary limit on your travel and Mr. Forgione's "liar" remark are insufficient to constitute harassment. First, these incidents were not frequent but rather both

occurred within the last two weeks of your employment. *See, e.g., Sullivan v. Catholic University of America*, 387 F.Supp.2d 11, 15 (D.D.C. 2005) (isolated comments and incidents attributed to an associate vice-president did not in the aggregate show that university-employer perpetrated a deliberate plan to force an employee's resignation). Second, neither of the incidents was severe – constituting discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive enough to alter the conditions of employment." *Ramey*, 2006 WL 1102836 at fn.8 (*citing Stewart*, 275 F.3d at 1133). The incidents are more in the nature of "mere offensive utterances" than "physically threatening or humiliating" behavior. *Faragher*, 524 U.S. at 787-88 (*quoting Harris*, 510 U.S. at 23); *Nichols*, 2006 WL 808066 at *8. Finally, neither the limitation on your travel budget nor the "liar" remark unreasonably interfered with your work performance; the travel was not required by your job and the comment itself did not prevent you from performing your duties. *Id.*

It should be noted that even if the aforementioned claims satisfied the second prong of the *prima facie* test, a preponderance of the evidence in the investigative record does not establish that the alleged harassment was based on your membership in the protected class or that it affected a term, condition or privilege of employment, the third and forth requirements, respectively, of a *prima facie* showing. *Davis*, 275 F.3d at 1122-23; *Nichols*, 2006 WL 808066 at *8; *Hussain*, 435 F.3d at 366.

### 3. Termination

As part of the harassment *prima facie* showing, a complainant must demonstrate the harassment was based on complainant's membership in the protected class. This is the same as the *prima facie* requirement for disparate treatment analyses which demand that "allegations give rise to an inference of discrimination by the defendant based on" protected class status. *Glenn v. Williams*, 2006 WL 401816 at *35 (D.D.C. February 21, 2006); *Bryant v. Brownlee*, 265 F.Supp.2d 52, 63 (D.D.C. 2003). As described in Section III(A)(3) above, you fail to meet this requirement.

## C. Retaliation

### 1. *Prima Facie* Analysis

To substantiate a *prima facie* case of retaliation, a complainant must demonstrate that: (1) she engaged in a statutorily protected activity; (2) the employer took an adverse action; and (3) there is a causal relationship between the two. *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003); *Clipper v. Billington*, 414 F.Supp.2d 16, 25 (D.D.C. 2006); *Romero-Ostolaza v. Ridge*, 370 F.Supp.2d 139, 148 (D.D.C. 2005)

(*citing Brown*, 199 F.3d at 452). Once a complainant establishes a *prima facie* case of retaliation, the employer must articulate a legitimate nonretaliatory reason for its action; finally, the complainant has the ultimate burden of establishing that the reason asserted by the employer is pretext for retaliation. *Cones v. Shalala*, 199 F.3d 512, 520 (D.C. Cir. 2000); *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006).

2. **Alleged Adverse Actions Other Than Termination**

A preponderance of the evidence in the investigative record demonstrates that you first engaged in statutorily protected activity by contacting Ex-Im Bank's EODP office on May 17, 2005 and complaining about travel-related issues, to include the $1250 limit placed upon your international travel. *IR Ex. B(7)*. As such, your allegation in that regard cannot be a valid retaliation claim as it pre-dates the protected activity which serves as the basis for your retaliation claim.

While the evidence demonstrates you engaged in statutorily protected activity on May 17, 2005, your allegations that Mr. Forgione called you "a liar" on May 19, 2005 and that Mr. Forgione held a staff meeting on May 23, 2005 during which he announced your termination and his reasons for it, and stated that he "could not see the same thing happening to anyone else in the office" do not constitute adverse actions under retaliation law. An adverse action for purposes of retaliation law is one "that well might dissuade a reasonable employee from making or supporting a charge of discrimination." *Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006). The alleged adverse action must be "material" or "significant." *Id.* at 1219 (*quoting Brown*, 199 F.3d at 457) (plaintiff must demonstrate "materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm"). As with your disparate treatment claim, the monetary limitation on your travel and comments made by Mr. Forgione at the May 23, 2005 meeting are too immaterial and inconsequential to constitute adverse actions for purposes of retaliation law. Furthermore, even if the alleged conduct constituted cognizable adverse actions, the investigative record fails to demonstrate that said actions give rise to an inference of discrimination, the third prong of *prima facie* test. *Morgan*, 328 F.3d at 651; *Clipper*, 414 F.Supp.2d at 25; *Romero-Ostolaza*, 370 F.Supp.2d at 148. Finally, beyond the *prima facie* requirements, Ex-Im Bank articulated legitimate, nondiscriminatory reason for its actions; a preponderance of the evidence in the investigative record does not substantiate that such reasons were pretexts for discrimination. *Cones*, 199 F.3d at 520; *Holcomb*, 433 F.3d at 901.

3. **Termination**

The investigative record demonstrates that you are a protected class member and that you were subjected to an adverse action (termination), satisfying the first two prongs of a *prima facie* retaliation case under Title VII and the ADEA. However, the evidence does not substantiate that a causal connection exists between your protected class status and termination. *Morgan*, 328 F.3d at 651; *Clipper*, 414 F.Supp.2d at 25; *Romero-Ostolaza*, 370 F.Supp.2d at 148. The uncontroverted evidence demonstrates that prior to terminating you, neither Mr. Forgione nor Mr. O'Connor were aware of any activity in which you participated with the EODP office. *IR Ex. D(2)* at 14; *IR Ex. D(3)* at 4. As such, no causal connection exists to substantiate your retaliation claim with regard to your termination. *Laboy v. O'Neill*, 2002 WL 1050416, at *1 (D.C. Cir. March 13, 2002) ("because the official responsible for ordering appellant's termination was unaware of appellant's prior EEO activity, appellant failed to establish a *prima facie* case of retaliation") (*citing Clark Country School District v. Breeden*, 532 U.S. 268, 272-73, 121 S.Ct. 1508, 149 L.Ed.2d 509) ("alleged discriminating official's knowledge of prior equal employment opportunity (EEO) activity must precede official's contemplating adverse action"); *Ficken v. Rice*, 2006 WL 123931 at *11 (D.D.C. 2006); *Buggs v. Powell*, 293 F.Supp.2d 135, 150-51 (D.D.C. 2003). Finally, beyond the *prima facie* analysis, Ex-Im Bank articulated legitimate, nondiscriminatory reasons for your termination; a preponderance of the evidence in the investigative record does not substantiate that such reasons were pretexts for discrimination. *Cones*, 199 F.3d at 520; *Holcomb*, 433 F.3d at 901.

## IV. Conclusion

A preponderance of the evidence in the investigative record does not support your allegation that you were subjected to disparate treatment and harassment based upon sex (female), age (45 years old) and reprisal, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA").

## V. Notice of Appeal Rights

### A. EEOC Appeal

You have a right to appeal this matter to the Equal Employment Opportunity Commission ("EEOC") within thirty (30) days of your receipt of this Final Agency Decision or, if you are represented by counsel, within thirty (30) days of your counsel's receipt of this Final Agency Decision. 29 CFR §§ 1614.110(b); 401(a); 402. To appeal, you must complete the attached EEOC Form 573, Notice of Appeal/Petition, and should indicate what is being appealed. 29 CFR § 1614.403(a).

Appeals must be mailed to:

Director, Office of Federal Operations,
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, DC 20036

or hand-delivered to:

Equal Employment Opportunity Commission
Office of Federal Operations
Appellate Review Programs
1801 L Street, NW
Washington, DC 20507

or sent by facsimile to: (202) 663-7022.

*Id.*; EEOC MD-110 at 5-4.

You should furnish a copy of the appeal to Ex-Im Bank at the time it is filed with the EEOC. 29 CFR § 1614.403(b). In or attached to the appeal to the EEOC, you must certify the date and method by which service was made on Ex-Im Bank. *Id.* If you do not file an appeal within the time frames described above, your appeal shall be dismissed by the EEOC as untimely. *Id.* at 1614.403(c).

Any statement or brief in support of your appeal must be submitted to the Office of Federal Operations within thirty (30) days of filing the notice of appeal. *Id.* at 1614.403(d). The Office of Federal Operations will accept statements or briefs in support of an appeal by facsimile transmission, provided they are no longer than ten (10) pages long. *Id.*

**B. Filing a Civil Action**

Additionally, you have the right to file suit in federal court:

1. Within ninety (90) days of your receipt of this Final Agency Decision if no appeal to the EEOC has been filed;

2. Within 90 days of receipt of the EEOC's final decision on appeal;

3. After 180 days from filing an appeal with the EEOC if there has been no final decision by the EEOC.

*Id.* at 1614.110(b); 1614.407; MD-110 at 5-4. The proper defendant for any such suit is currently James H. Lambright, Acting Chairman, Export-Import Bank of the United States. *Id.*

Should you have any questions, you may contact me at (202) 565-3561.

Very truly yours,

Michael Cushing

Michael Cushing
Senior Vice-President
Resource Management

# PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974. Public Law 93-597. Authority for requesting the personal data and the use thereof are given below).

1. **FORM NUMBER/TITLE/DATE**: EEOC Form 573, Notice of Appeal/Petition, January 2001

2. **AUTHORITY**: 42 U.S.C. § 2000e-16

3. **PRINCIPAL PURPOSE**: The purpose of this questionnaire is to solicit information to enable the Commission to properly and efficiently adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4. **ROUTINE USES**: Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files; (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data base for statistical purposes.

5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION**: Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

---

**Send your appeal to:**

The Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 19848
Washington, D.C. 20036

# NOTICE OF APPEAL/PETITION TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

OFFICE OF FEDERAL OPERATIONS
P.O. Box 19848
Washington, DC 20036

**Complainant Information:** **(Please Print or Type)**

| | |
|---|---|
| Complainant's Name (Last, First, M.I.): | |
| Home/mailing address:<br>City, State, ZIP Code: | |
| Daytime Telephone # (with area code): | |
| E-mail address (if any): | |

**Attorney/Representative Information (if any):**

| | |
|---|---|
| Attorney Name: | |
| Representative Name (Non-Attorney): | |
| Address:<br>City, State, Zip Code: | |
| Telephone number: | |
| E-mail address (if any): | |

**General Information:**

| | |
|---|---|
| Name of the agency being charged with discrimination: | |
| Identify the Agency's complaint number: | |
| Location of the duty station or local facility in which the complaint arose: | |
| Has a **final action** been taken by the agency, an Arbitrator, FLRA, or MSPB on this complaint? | ____ Yes; Date Received ________________ **(Attach a copy)**<br>____ No<br>____ This appeal alleges a breach of settlement agreement |
| Has a complaint been filed on this same matter with the EEOC, <u>another</u> agency, or through any <u>other</u> administrative or collective bargaining procedures? | ____ No<br>____ Yes **(Indicate the agency or procedure, complaint/docket number, and attach a copy, if appropriate)** |
| Has a civil action (lawsuit) been filed in connection with this complaint? | ____ No<br>____ Yes **(Attach a copy of the civil action filed)** |

**NOTICE**: Please **<u>attach a copy of the final decision or order</u>** from which you are appealing. If a hearing was requested, please attach a copy of the agency's final order and a copy of the EEOC Administrative Judge's decision. Any comments or brief in support of this appeal MUST be filed with the EEOC **and** with the agency **<u>within 30 days</u>** of the date this appeal is filed. The date the appeal is filed is the date on which it is postmarked, hand delivered, or faxed to the EEOC at the address above.

| | |
|---|---|
| Signature of complainant or complainant's representative: | |
| Date: | |

**EEOC Form 573 REV 1/01**